**ADDISON et al. v. BALL.　(No. 10614.)**

(Court of Civil Appeals of Texas. Fort Worth. April 12, 1924. Rehearing Denied May 24, 1924.)

1. **Trusts ⚖══90—Whether resulting trust established in land held for jury.**

Whether evidence established resulting trust in land. *held* for jury.

2. **Trusts ⚖══77 — Payment, or agreement to pay, must occur before or at time of purchase to establish resulting trust.**

To establish resulting trust in real estate in favor of one not named as grantee in deed, by reason of fact that he has paid purchase money or part thereof, or has bound himself to make such payment, it is necessary to show that such payment or agreement to pay occurred before or at time of purchase and as a part of transaction.

3. **Trusts ⚖══80—No resulting trust in favor of lender of money.**

If money furnished to pay purchase price of land is a loan to person who takes legal title, there is no resulting trust in favor of lender.

4. **Trusts ⚖══89(5)—Resulting trust need not be shown by more than one witness.**

Resulting trust must be shown with clearness and certainty, but need not be shown by testimony of more than one witness; two witness rule being applicable only to cases in which it is sought to establish trust by proving declarations of deceased trustee, or where trustee is testifying to trust in his own interest.

**On Motion for Rehearing.**

5. **Trusts ⚖══88—Trust in land may be shown by parol.**

A trust in land can be shown by parol evidence.

6. **Evidence ⚖══269(1)—Acts and declarations of parties admissible to show trust in land.**

Acts and declarations of all parties to deed in transaction which led up to its execution, and also subsequent acts and declarations of the grantee named in the deed, are admissible to show trust in land.

7. **Evidence ⚖══217—Oral admissions of parties competent evidence.**

Oral admission of a party was competent evidence against him as to such facts as are provable by parol evidence.

Appeal from District Court, Montague County; C. R. Pearman, Judge.

Action by Nelle Addison, as administratrix of the estate of J. A. Addison, deceased, and another, against M. F. Ball. Judgment for defendant, and plaintiffs appeal. Reversed and remanded.

W. O. Davis, of Gainesville, and Jameson & Crain, of Montague, for appellants.

Benson & Benson, of Bowie, for appellee.

DUNKLIN, J. Nelle Addison, as the administratrix of the estate of J. A. Addison, deceased, and Gertrude Clark, administratrix of the estate of J. G. Clark, deceased, instituted this suit against M. F. Ball to recover an undivided one-half interest in 80 acres of land, upon allegations to the effect that the two decedents named were, during their lifetime, partners dealing in land, oil stock, and gas leases; that on or about March 15, 1917, J. A. Addison, acting for and in behalf of the firm of Addison and Clark, entered into an agreement with the defendant, Ball, to purchase the land in controversy, for a consideration of $2,000 in cash and the assumption of an outstanding mortgage lien note against the land for $1,000. It was further alleged that J. A. Addison and M. F. Ball each paid $1,000 of the cash consideration, and that it was agreed between them at the time that the deed should be taken in the name of M. F. Ball as grantee; and that the property was purchased from A. M. Boutwell, under and by virtue of that agreement; Addison and Ball each paying the cash consideration of $1,000. It was further alleged that the $1,000 paid by Addison was paid out of the partnership funds of Clark and Addison.

It was further alleged that on August 11, 1919, M. F. Ball sold an oil and gas lease on one-half of the land to a partnership firm

composed of several persons, of whom the said J. G. Clark and J. A. Addison were members; that said Clark and Addison paid $200 of the consideration for the lease, and thereby became the owner of an undivided one-twentieth interest in said lease, and that by reason of their one-half interest in the title to the land they became the owners and were entitled to receive one-half of the rentals realized by defendant Ball, which amounted to $80. In their petition plaintiffs prayed for a recovery of an undivided one-half interest in the land and one-half of the rentals; each of the plaintiffs as legal representatives of said decedents, respectively, being entitled to one-half of the recovery. Plaintiffs further prayed for general relief.

In addition to a general denial the defendant pleaded specially that he never at any time had any transaction with J. G. Clark, deceased, in any way connected with the purchase of the land, but that, after he had purchased the land from Boutwell on March 15, 1917, he entered into an agreement with J. A. Addison, deceased, who was acting for and in behalf of the Nocona National Bank, of which he was president, by the terms of which he borrowed the sum of $1,000 from the bank, or Addison, to pay on the purchase price of the land, and that after the purchase was consummated, it was orally agreed between the defendant and J. A. Addison, acting for and on behalf of the bank, that said loan of $1,000 would be secured by an oral lien against the land until such time as defendant would repay the same.

It was further alleged that on August 12, 1919, the defendant paid to J. A. Addison the sum of $1,000, with interest thereon in full satisfaction of said loan, and that the oral lien so given to secure the same was thereby discharged. It was further alleged that at the time the defendant took title to the land no agreement had been made that Addison would, or should, have any interest therein.

The case was tried before the court without a jury, and judgment was rendered, denying plaintiffs a recovery of any interest in the land. Plaintiffs have appealed.

The court filed the following findings of fact and conclusions of law:

"At the request of plaintiffs I make and file the following as my conclusions of fact and law.

"(1) On March 15, 1917, A. M. Boutwell conveyed to M. F. Ball 80 acres of land situated in Montague county, Tex., and more fully described in plaintiffs' petition. The purchase price for said land was $3,000, $2,000 of which was paid by deposit to the credit of A., M. Boutwell in the Nocona National Bank on March 8, 1917. On March 7, 1917, the defendant. M. F. Ball, borrowed from the Nocona National Bank $2,000 in money. The remaining $1,000 due for the purchase price of the land has been taken care of by the defendant, M. F. Ball, but the said M. F. Ball, after the death of J. A. Addison, made an effort to induce Mrs. Addison to raise $500 to be used in paying the remainder of the purchase price for said land.

"(2) According to the statements of M. F. Ball made to several different parties, he and J. A. Addison were partners in the land and oil business, and on September 5, 1919, M. F. Ball made a written statement purporting to give a list of some partnership property owned by him and J. A. Addison, in which the 80 acres of land in controversy in this suit was named. This written statement was in the handwriting of M. F. Ball, but was never acknowledged before a notary. M. F. Ball, the defendant, has always rented the land in controversy, collected the rents therefor, and paid the taxes thereon, and, in general, has exercised ownership over the property. The defendant, Ball, made verbal admission to several people that J. A. Addison owned an interest in this land, but there is nothing in evidence to show that said Addison ever paid any part of the consideration or that there was, an agreement between him and Ball that he, Addison, should have an interest in the land, made prior to the purchase of said land.

"Conclusion of Law.

"In my judgment, the evidence in this case is too uncertain to justify me in finding that plaintiff ever had any interest in this land."

We have all read the statement of facts in full and shall attempt to set out the evidence bearing upon the pivotal issue as to whether or not a resulting trust of an undivided one-half interest in the land was established in behalf of plaintiff Nelle Addison as administratrix of the estate of J. A. Addison, deceased, or in behalf of both plaintiffs jointly, as legal representatives of their respective decedents.

Plaintiff Mrs. Nelle Addison, who was the surviving wife of J. A. Addison, deceased, testified as follows:

"I live in Montague county. I am the administratrix of J. A. Addison. During the year 1918 or 1919 I had a conversation with M. F. Ball with reference to the ownership of an 80-acre tract of land located near Eagle Point, which is known as the J. F. Lemon's farm. I was living in Nocona, Tex., on the north side of town at the time. My home was between the business part of town and Mr. Ball's residence. The first conversation we had about it was during the oil boom; we were just talking about oil and things, and Mr. Ball told me about this 80 acres at this time. He told me that Mr. Addison had told him that he had confidence in his ability, and that anything he would pick up that way that he would go half with him, and he told me that they owned this 80-acre tract near the Williams well. He told me that it was the partnership property of him and Mr. Addison. He first asked me if Mr. Addison had told me about this property—this 80 acres— and I told him at that time that he had not, and he said, 'Well, we own this 80 acres; he and I together.' He said that Mr. Addison had agreed that anything he wanted to buy that way, leases, anything he thought was good out there or anywhere else, that he would take half of it; that they would buy it together, and he told me that they bought this together. We

have talked about this a number of times; just at different times mentioning it, more than once he said that, if they got oil at the Williams well, it would make us rich. He said, 'Us.' We talked of it a number of ways. I don't have any idea how many times we have talked about it. I am sure we have talked about it more than three times, but I know he has talked to me numbers of times about it, because he would stop there numbers of times in passing, and I would be out on the porch or in the yard. I was terribly excited about it. I thought we would get wealthy right now. This conversation we first had was during the boom at Burkburnett, along about the time of the excitement at the Williams well. It was during Mr. Addison's lifetime, nearly two years before his death. The first time that Mr. Ball ever told me that all of the land belonged to him was this past August, 1922. Every time I talked with him he never insinuated that it wasn't part mine until that time. I said, 'Do I still have an interest in that?' and he said 'No.' He told me that at the time I lost my interest in the land was before Mr. Addison's death; that Mr. Addison told him he had rather have the money than the land and get out of it. And this past summer was the first time that he had told me this. * * * He did tell me this last summer that at the time they leased the land Mr. Addison wanted his interest out, and told me that at the time of the leasing that Mr. Addison said he had rather have the money than the land. I believe is the way he put it. The first conversation I had with him, in which he told me that he and Mr. Addison were interest in the land together, was during the excitement over at the Williams well. * * * Since Mr. Addison's death, Mr. Ball came to my home on the south side of Nocona and wanted me to pay $500 on a loan against the place. He said that there was $1,000 against it, and he wanted me to pay $500 of it. I told him that I could not get any money in any way to pay this $500, and then he asked me if I had collected my insurance. This conversation was in 1921; anyway, it was in the winter just following Mr. Addison's death; along in January or February."

F. A. Berry, witness for plaintiff, testified as follows:

"My name is E. A. Berry. I live in Hollis, Okl. I am a brother of Mrs. Addison. After Mr. Addison's death in 1920, I had an active part in looking after his business interests. I was in Nocona off and on all along. While I was there looking after Mr. Addison's interests, I had a conversation with M. F. Ball with reference to this 80 acres of land located near Eagle Point. It was in the spring of 1920, I believe; he came to me one day and asked me what I thought we had better do about a $1,000 note that was past due on the tract of land out north of town, and I asked him what tract it was, and told him I didn't know anything about it, and he went ahead and said they had bought 80 acres; an 80-acre tract of the Lemon's farm, he and Jim together, and there was a note then past due, and he says, 'We have either got to pay it or let it go back.' He asked me what I thought was best to do. I said I didn't know anything about it. I asked him what the land was worth, and he said it wasn't

worth much for farming purposes. I think he named $10. an acre as being a fair price for it; said they bought it for the oil and mineral rights; said they didn't pay much down on it. My recollection is that he told me they had paid $500 down on it, and I said, 'Well, if the land isn't worth over $10 an acre, I don't see any reason for flumping off $1,000 for $800 worth of property.' I said, 'Mrs. Addison doesn't have any money now, anyway,' and he said he didn't. He says, 'I feel the same way about it. I think the best thing to do is to just let it go back.' I didn't know who it was bought from or who the $1,000 was going to. I said, 'That seems to be the best thing to do; you just use your own judgment.' This conversation was about five months after Mr. Addison's death. He said he and Jim Addison bought it together. * * * Yes, that is about the extent of the conversation. The discussion was not prompted by reference to the payment of $90 insurance money. I didn't know anything about the $90 proposition until quite a while after that. My recollection is that he told me that they paid only $500 down on the land; anyway, it was a small amount."

T. W. Williams, a witness for plaintiff, testified:

"My name is T. W. Williams. I live at Austin, Tex. I knew J. A. Addison and J. G. Clark in their lifetime. They were partners in land, oil, and leases and other things. I know that they were partners, for I handled a place that belonged to them. I know from handling their affairs since their death that they were partners. Some time about September, 1921, I had a conversation with M. F. Ball with reference to the ownership of 80 acres of land located near Eagle Point, Tex. He and I sat down, and I asked him about this, and he told me in this conversation that Clark had nothing to do with it. He said Mr. Addison cautioned him not to let Clark know anything about it, and he said it was him and Addison that owned the property, and I said to him, 'Mr. Ball, don't you know that when you leased that land that Mr. Clark received his part of the lease money?' and he said he didn't know a thing about that. He didn't state what interest Addison had in the property; he said it belonged to him and Addison. This conversation took place after the deaths of both Clark and Addison. It was after the death of Clark; he died a year later than Addison; I think it was about August when he died and it was that same year. And Ball said later in that same conversation that he had taken up Addison's part of it. * * * No, he didn't say he had repaid Addison 'anything; he said when they got the lease money Addison just quit him. No, he didn't tell me that Addison didn't have an interest in it. He didn't say he had taken up Addison's interest; he said Addison just quit him. I didn't say a minute ago that he told me Addison's interest had been taken up by him; I said he told me that Addison just quit him. I think that is what I said. I am related to Jim Clark, he was my brother-in-law, I married his sister. No, I don't believe he told me the details of how he and Addison made the trade. No, I don't think he told me just where Addison's interest came in the property. The conversation came up like this. I went up there trying to settle up the affairs

of that estate, and I had in my mind that they owned an interest in that tract of land. I asked him if they did, and he told me that Jim Clark didn't have any interest in it. Yes, I went up there to collect some money due on some insurance; that was on another case. That was the only time I ever discussed with Ball the matter of interest of Addison and Clark in that property; that was in September, 1921. But now as to that other question about the $90, if that conversation was touched upon at that present time, I know nothing about it. I was talking to him about the other. I approached Ball about this other matter about the insurance business prior to that time, and then I talked to him about it. I approached him direct on this question. He told me that Jim Clark had no interest in it, and that he and Addison owned it together; then later on in this same conversation he told me that Addison had dropped his interest, just quit the thing after he got his lease money."

Plaintiff then introduced in evidence the following statement which was found among the papers of J. A. Addison, deceased, after two witnesses had testified that the same was in the handwriting of the defendant, and which the court found to be in his handwriting:

"M. F. Ball.
    "Box 10   Partnership Oil Stock M. F. Ball and
        J. A. Addison.
                "Nocona, Texas, Sept. 5, 1919.
"270 shares in Nocona oil and gas.
"10 shares in Nocona Burk
"2 shares in B. B.
"2 shares in B. B. home No. 1.
"1 share in School House B. B.
"1 share in Safety First Oil Co., Electra.
"$200 in lease on 40 acres Eagle Point.
"80 acres of land Eagle Point.
"½ in 80-acre lease Bowerman near town, Clark and Skinner.
"½ in 200-acre lease A. L. Steward southwest town."

The defendant, Ball, testified as follows:

"My name is M. F. Ball. I am the defendant in this case. Prior to the time Mr. Boutwell conveyed this property to me I had not discussed the matter of the purchase with Mr. Addison. Prior to the time the deed was made I had said nothing to Mr. Addison about his having any interest in the land. After I took the deed, I discussed it with him. It was after the property was paid for. I got '$1,000 of the purchase money from Mr. Addison; from the bank rather. At the time I got the $1,000 nothing was said about his getting or having an interest in the land.

"Mr. Crain: We object to that; the question asks about a transaction with the deceased.

"The Court: I will sustain the objection.

"Well, I got this money for the lease. I paid Mr. Addison the $1,000 and interest that I owed him. I did this immediately after I got the money for the lease. I have always paid the taxes on the land. I paid the repair bills. I paid the interest on the $1,000 note. The note has been renewed. I renewed it. Mr. Addison took the acknowledgment to the deed at the time I purchased the property. Prior to the time the deed was taken the acknowledgment taken, and the payment made nothing was said between Mr. Addison and me relative to his having an interest in it. The deed was taken in the forenoon; that afternoon I discussed the matter with Mr. Addison. Prior to that time I had had no discussion with Mr. Addison relative to an interest in the land. I did not prepare that instrument on September 5th. I did not prepare any instrument showing an interest in Mr. Addison. Mr. Addison did not have any interest in the land after the lease was made on the 12th day of August. His representatives have not offered to pay any of the indebtedness against the land. * * * I asked Mr. Addison if I could get the $1,000 before I closed this deal. I got the money before the deal was closed; he told me I could get it. I got the money the day the deed was made. I am positive I got the money the day the deed was made after I paid the man for the place. I paid the man for the place that day. I got $1,000 from the bank, and I did not give a note for that. I don't remember whether I borrowed any other money that month or not. I don't remember whether I borrowed as much as $1,000 at any other time that month. I gave Boutwell a check for $2,000 the day the deed was made, March 15th. I paid the $2,000 the day the deed was made, and assumed the $1,000 note. The same day the deed was made I paid Boutwell $2,000 for the land; I got the $1,000 from the bank right there that day. I don't remember what the amount of the check was that I gave Boutwell. I disremember whether I gave him a check for $1,000 or $2,000. After this deed was made, Boutwell and his wife went out there. I went back in the afternoon and told Mr. Addison I wanted to fix up the note for the $1,000, and he said to just let it go, 'I will just hold an interest until you pay this money back.' I didn't owe Boutwell any other money at this time, didn't buy anything else from him and I didn't give him any other check that month. I paid the $1,000 back to the bank when I sold the lease. I sold the lease August 11th, something like two years. I paid it immediately after I executed the lease; I don't remember the exact date, but it was immediately after I sold the lease. It seems to me that I remember something about that paper right after the transaction. I didn't know until to-day that you had it. * * * Yes, some-one, I cannot recall who, told me several days ago that the plaintiffs had some kind of a writing. I did repay the $1,000 I got from the bank."

The defendant then rested.

In rebuttal plaintiff introduced Miss Ruth Davis as a witness, who had previously testified that the statement above copied was in the handwriting of the defendant Ball. She further testified as follows:

"I went to work in the Nocona National Bank the 3d of April, 1918. I am familiar with their business system; their deposit slips. I know the writing of J. A. Addison. This piece of paper is a deposit ticket. It is in the handwriting of J. A. Addison, deposited to the credit of A. M. Boutwell; the amount is $2,000.

"Mr. Crain: We want to introduce this in evi-

dence for the purpose of impeaching the defendant.

"The Court: What is the date of it?

"The Witness: March 8th.

"Mr. Benson: We object to the introduction of it for the reason that it is immaterial, irrelevant to any issue in this case, and it is not properly shown that it is evidence or any credit or that any credit was given any one, and, if it was given any credit, the books showing the entry wherein the credit was given would be the best evidence that it is not shown that this ticket was kept and preserved as part of the records of the bank.

"The Court: I will overrule the objection. The bank keeps those deposit slips; it is a part of the system of bookkeeping in the regular course of the bank's business. They keep them all as a part of the records.

" 'Plaintiffs' Exhibit 2.

" 'The Nocona National Bank.

" 'Deposited by A. M. Boutwell.

" 'Nocona, Texas, March 8, 1917.

" 'Checks as follows:

" 'Ball ........................$2,000.00.'

"This is another deposit slip in Mr. Addison's handwriting.

"Mr. Benson: We also object to that.

"The Court: I will overrule the objection.

"Mr. Benson: Note our exception for the reason heretofore stated.

" 'Plaintiffs' Exhibit 3.

" 'The Nocona National Bank.

" 'Deposited by M. F. Ball.

" 'Nocona, Texas, March 6, 1917.

" 'Checks as follows:

" 'Note ........................$2,000.00.' "

Cross-examination by Mr. Benson:

"That word is note, n–o–t–e. No, I haven't the note. Whose note was it? No, I didn't look these transactions up before I came over here. Mr. Anderson got the deposit tickets for them. No, Mr. Anderson isn't here. That indicates that a note was deposited for $2,000. And that two days following he paid Boutwell $2,000. That's what the deposit slips indicate. I haven't looked at the note register to see if Mr. Ball borrowed the money. But if Mr. Ball paid the note it is in his possession."

[1] The only assignment of error presented in briefs for appellants reads as follows:

"The court erred in holding as a matter of law that the evidence in this case was too uncertain to justify his finding that the plaintiffs had ever had any interest in the land described in plaintiffs' petition."

It will be noted that the court found that the defendant, Ball, in his statements to several different parties admitted that he and J. A. Addison were partners in the land and oil business, and that on September 5, 1919, he made a written statement giving a list of such partnership property owned by him and Addison, in which the 80 acres of land in controversy was included, and that he also made admissions to several persons that J.

A. Addison owned an interest in the land. The court further found that, after the death of J. A. Addison, the defendant made an effort to induce the plaintiff Mrs. Addison to raise $500 to be used in paying the remainder of the purchase price due on the land. But the court concluded his findings of fact with this statement:

"But there is nothing in evidence to show that said Addison ever paid any part of the consideration or that there was an agreement between him and Ball that he, Addison, should have an interest in the land, made prior to the purchase of said land."

And in his conclusions of law, the court said:

"The evidence in this case is too uncertain to justify me in finding that plaintiff ever had any interest in this land."

The defendant, Ball, did not deny making any of the statements attributed to him by any of the witnesses referred to in the court's findings and set out in the evidence copied above. He did deny that the list of property purporting to have been made by him and showing that the land in controversy belonged to him and J. A. Addison, jointly, was in his handwriting, but the court discredited his testimony as to that, as shown by his findings.

We construe the court's conclusions last above quoted as conclusions that the facts found by him, although true, were insufficient, as a matter of law, to prove that Addison ever paid any part of the consideration for the land, or that there was any agreement between him and Ball prior to its purchase that he should have an interest therein. We believe that in that conclusion the court erred.

[2, 3] It is a familiar rule that in order to establish a resulting trust in real estate in favor of one not named as a grantee in the deed, by reason of the fact that he has paid the purchase money or a part thereof, or has bound himself to such payment, it is necessary to show that such payment or agreement to pay occurred before or at the time of the purchase and as a part of the transaction. Parker v. Coop, 60 Tex. 111; Burns v. Veritas Oil Co. (Tex. Civ. App.) 230 S. W. 440, and other authorities there cited. If money furnished to pay the purchase price is furnished as a loan to the person who takes the legal title, then there is no resulting trust in favor of the lender. Guest v. Guest (Tex. Civ. App.) 208 S. W. 547.

[4] However, the following was said in Pierce v. Fort, 60 Tex. 464:

"But as to the quantity and character of the proof necessary to show that the deed was a mortgage, the court instructed the jury as follows: 'I furthermore charge you that the law will not warrant you in finding the deed a mortgage, unless the fact that it was intended to

be such be proven by at least two witnesses, or by one witness and strong corroborating circumstances.'

"This was error. In support of it counsel for appellee refers us to the case of Moreland v. Barnhart, 44 Tex. 275. In that case, Mr. Justice Reeves (on page 283) remarks as follows:

"'That a deed absolute on its face may be shown by parol to be intended as a trust has been often decided by this court. The trust must be shown with clearness and certainty, and in some of the cases it has been held that it must be shown by the testimony of more than one witness, unless his testimony be confirmed by corroborating circumstances.'

"He cites a number of cases from our reports, and among them Miller v Thatcher, 9 Tex. 482, in which the technical rule is laid down as it was given by the judge below in the trial of the present cause.

"But in the later case of Gaines v. The Exchange Bank, decided at Austin in 1882 (1 Law Reporter, p. 477), it was held that this technical rule was applicable only to cases in which it was sought to establish the trust by proving the declarations of a deceased trustee, or where the trustee was testifying to the trust in his own interest."

The rule there announced, as to the quantum of proof necessary to establish a resulting trust in land, has been followed in the following cases: American Freehold Land Mortgage Co. v. Pace (Tex. Civ. App.) 56 S. W. 393 (local citation), writ of error refused 58 S. W. XV; Allen v. Williams (Tex. Civ. App.) 218 S. W. 135, writ of error dismissed for want of jurisdiction; Graves v. Graves (Tex. Civ. App.) 232 S. W. 543, writ of error refused; Hall v. Hall (Tex. Civ. App.) 198 S. W. 636, writ of error refused, and other decisions there cited.

In Allen v. Williams, supra, the court quoted with approval from the opinion of American Freehold Land Mortgage Co. v. Pace, cited above, relative to the strict rule as to the quantum of proof in such cases, usually termed the "two witness rule;" the following:

"Such a rule, we think, has no foundation in principle; for, if the evidence is of such a character, whether it comes from one or many witnesses, as to satisfy the conscience of the court that its equitable relief should be administered, no hesitancy should be felt in applying the principles that would govern the particular case. It would be a singular proposition to announce that the law more sacredly guards and protects the property of the citizen than it does his life or liberty; yet an admission of the insistence of appellant would necessarily lead to the conclusion that life or liberty could be lost on less evidence than would be required to deprive him of an apparent right in property."

Under the doctrine of those decisions, which we believe is now well established in this state, and which is contrary to the more strict rule announced in other authorities, the conclusion reached by the trial judge in this case, and already referred to, was error, on account of which the judgment must be reversed and the cause remanded, and it is so ordered.

## On Motion for Rehearing.

In the case of Carl v. Settegast, 237 S. W. 238, by the Commission of Appeals, cited by appellee in his motion for rehearing, there is a discussion of the rule as to quantum of proof necessary to engraft a parol trust upon a deed to realty. And in that case the following was quoted from the decision by the same court in Briscoe v. Bright, 231 S. W. 1082:

"The sufficiency of proof to meet the requirement that it should clearly and satisfactorily establish a contract which the courts can enforce is presented here only as a question of law. Conceding for the purposes of this case that the contract sought to be enforced falls within the rule requiring that its terms be proved clearly and satisfactorily and treating the question as one of law only, the evidence must be viewed most strongly in support of the trial court's judgment. The fact that the witnesses who testified may not have been disinterested, or may have made conflicting statements, or that their credibility may have been attacked, are matters with which it is not our province to deal. As we understand the rule contended for, it is not violated by objections to the evidence of this character. It only requires that the terms of the contract essential to recovery be supported by evidence sufficiently clear for the court to determine what those terms were without resorting to inference or conjecture. In this, as in every other class of cases that we now recall, the credibility of the witnesses and the weight to be given to their testimony are questions solely within the province of the jury, subject, however, to be revised by the trial judge and the Court of Civil Appeals."

But in that case the judgment of the trial court was reversed because the jury was instructed that in order to engraft such a parol trust the burden was on the plaintiff to establish that contention by evidence "clearly and to the satisfaction of the jury."

We do not believe that the doctrine announced in the quotation above shown is different in any material respect from the conclusions we have reached on original hearing.

Appellee urgently insists that the testimony shown in the statement of facts by three different witnesses to admissions made by him to the effect that Mr. Addison owned a half interest in the land in controversy, and which testimony was not controverted by Ball, even when considered in connection with the written statement to the same effect made by Ball and delivered to Addison before the latter's death, was insufficient to show either that Addison contributed one-half of the cash consideration of $2,000 paid for the land, or that the land was bought under a partnership agreement between Ball

and Addison that each should own one-half interest in the land and should pay one-half of the consideration therefor. While the admissions so proven were not specifically admissions of those facts, we think that they necessarily imply an admission of one or the other of those facts.

[5, 6] It is a well-settled rule of law in this state that a trust in lands can be shown by parol evidence. A. M. & B. Ass'n v. Brewster, 51 Tex. 257; Clark v. Haney, 62 Tex. 511, 50 Am. Rep. 536; Hudson v. Wilkinson, 45 Tex. 444. And in determining that issue testimony as to the facts and declarations of all the parties to the deed in the transaction which led up to its execution, and also the subsequent acts and declarations of the grantee named in the deed, admissible. Smith v. McElyea, 68 Tex. 70, 3 S. W. 258; Johnson v. Deloney, 35 Tex. 42. In the case of Grace v. Hanks, 57 Tex. 14, Bumpass had conveyed land to John R. Woolfolk, who had died. The suit was instituted by the creditors of Bumpass to subject the property to the payment of his debts, upon allegations that the conveyance to Woolfolk was without valuable consideration and made to defraud the creditors of Bumpass. The creditors recovered the land. The judgment was based upon the testimony of Dan Hopper. His testimony was as follows:

"I lived near the land in controversy, and was well acquainted with James M. Bumpass and John R. Woolfolk; knew them ever since I was a little boy, and knew Woolfolk until the date of his death. Bumpass was broken up by the war, and at the date of the deed from him to Woolfolk was involved. Woolfolk at the time of the making of that said deed was, like myself, pretty bad off financially, and had no property or means. After the conveyance from Bumpass to Woolfolk, I had a conversation with John R. Woolfolk, and he stated to me in that conversation that Bumpass conveyed the land to him to prevent it being sold for his debts; that Bumpass owed about $1,400 in New Orleans, and that he, Woolfolk, was to hold the land and sell it for Bumpass' benefit; that Bumpass was now living in Mississippi."

And in the opinion rendered in the case the following was said:

"The testimony of Hopper was admissible as to the declarations of Woolfolk, and, if supported by testimony, of even himself, as to other facts which corroborated sufficiently his testimony as to the declarations of Woolfolk, then the verdict of the jury should not be disturbed. This witness testified that he had known both Bumpass and Woolfolk from his childhood; that at the time Bumpass made the deed to Woolfolk he was heavily involved in debt, and that Woolfolk was then in poor financial condition, and had no property This was evidence not subject to such objections as is evidence of mere declarations of a deceased person; for it is subject to contradiction, and may easily be known to be untrue, if such be the case. * * *

"While proof of the declarations of Woolfolk would not have been sufficient to sustain the verdict, yet we are of the opinion that the other facts testified to by Hopper, in connection with the entire failure upon the part of the appellant to bring any evidence to rebut that which was given, presents a case in which we cannot say that the evidence was insufficient. The question was fairly presented to the jury by the charge of the court, and cannot now be disturbed."

[7] In Bonner v. Ogilvie, 24 Tex. Civ. App. 237, 58 S. W. 1027, it was held that an admission by a husband on the trial of the case that his wife's will devising all her property to him was duly probated was tantamount to an admission that everything necessary to vest title to her property in him had been done. It is a general rule that oral admissions of a party are competent evidence against him as to such facts as are provable by parol evidence. 22 C. J. 3001. See, also, 1 R. C. L. p. 490; 1 Greenleaf on Evidence, § 97.

"An admission is defined as 'a statement, oral or written, suggesting any inference as to any fact in issue, or relevant fact unfavorable to the conclusion contended for by the person by whom or on whose behalf the statement is made.'" Ogden v. Sovereign Camp, Woodmen of the World, 78 Neb. 804, 113 N. W. 524, 525.

"Anything said by the party may be used as against him as an admission, provided it exhibits the quality of inconsistency with the facts now asserted by him in pleadings or in testimony." Castner v. C. B. & Q. Ry. Co., 126 Iowa, 581, 102 N. W. 499, 501, 2 Wigmore, Evidence, §§ 1048, 1050.

Motion for rehearing is overruled.