Frances Beatrice SCOTT, Appellant,

v.

Herman B. COHRS, Appellee.

No. 3553.

Court of Civil Appeals of Texas.

Waco.

Jan. 15, 1959.

Rehearing Denied March 12, 1959.

Bracewell, Reynolds & Patterson, Houston, for appellant.

Charles A. Keilin, Houston, for appellee.

TIREY, Justice.

Appellant brought this suit for a divorce and for a division of community property. She joined appellee Cohrs upon allegations to the effect that he held a certain tract of land designated as Item 10 in her original petition, in trust for the community, and also alleged that he had joined her husband in practicing a fraud on her community interest. She prayed for the establishment of her interest in the tract of land and also for damages for the fraud. At the conclusion of plaintiff's evidence, defendant Cohrs filed a motion for an instructed verdict, and this motion was granted by the court, to which plaintiff excepted, and to which order she has perfected her appeal. After the court had directed a verdict in favor of defendant Cohrs, and after plaintiff and defendant Scott each had rested, the court heard the motion for severance of the causes of action alleged by plaintiff, and both plaintiff and defendant Scott asked the court to grant the motion for severance, and the court granted such motion, and severance was entered. The action of plaintiff against her husband proceeded to judgment and there is no appeal from this judgment.

The judgment entered against Mrs. Scott and in favor of defendant Cohrs is assailed on two grounds. They are substantially to the effect that the court erred (1) because there was a question of fact to submit to the jury as to whether or not William H. Scott had a beneficial interest in Item 10, the legal title to which was in appellee Cohrs; and (2) because Cohrs admittedly joined in fraudulent acts against the community, and there was evidence to submit to the jury as to Mrs. Scott's damages by reason thereof.

A statement is necessary. Appellant went to trial on her First Amended Original Petition. In paragraphs 8 and 9 we find the following allegations:

"VIII.

"The Plaintiff is a woman unskilled in matters of law and property management. Her husband, the Defendant, William H. Scott, is a lawyer who is skilled in matters of law and property management. The Plaintiff has reason to believe, does believe, and here alleges: That her said husband has, for a period of many years, followed a studied course of acquiring and concealing from the Plaintiff property in which he has an interest and control and which lawfully belongs to the community estate. On or about the first day of February, 1946, the Defendant, William H. Scott, acquired an interest in the tract of land situated in Block 293, S.S. B.B., City of Houston, Texas, described as Item 10, in the paragraph next above, which tract of land, with the improvements on it, are commonly known as the Montrose Apartments. In order to conceal from the Plaintiff the fact of his

having acquired such an interest in such property the Defendant, William H. Scott, and the Defendant, Herman B. Cohrs, entered into a conspiracy and agreement to defraud the Plaintiff by the terms of which agreement it was provided that the legal title to said Montrose Apartments should be placed in the name of the said Herman B. Cohrs. As a result of such conspiracy and agreement to defraud, the legal title to said tract of property was actually placed in the name of the Defendant, Herman B. Cohrs, and has been, since such date retained in his name, though the equitable ownership of at least an undivided interest, if not the entire value of such property is in the community of the Plaintiff and the Defendant, William H. Scott.

## "IX.

"The Plaintiff has reason to believe, and does believe, and here alleges that: For many years prior to the date of her separation, as hereinabove alleged, from the Defendant, William H. Scott, the said Defendant carried out a studious plan of concealing from Plaintiff assets properly belonging to the community estate of him and his said wife. That during such entire period of time the Defendant, William H. Scott, as head of the community, was in a position of trust with a duty to preserve the assets of the community, and to fully disclose and account to his said wife for the value thereof. By virtue of the nature of the relationship between the parties and the lack of capacity upon the part of the Plaintiff to obtain full information as to the assets of the community, it is impossible for her to specifically identify other assets than those listed above in paragraph VIII, in which the community owns an interest. The Plaintiff alleges, however, that other assets acquired by the community and in which the community owns valu-

able interests, have been concealed from her and that the value of the assets so acquired and so concealed from her by the said Defendant in breach of his trust and in fraud of the Plaintiff equals the value of the assets identified and listed in paragraph VIII above. And in the alternative, the Plaintiff alleges that, the Defendant, William H. Scott, being in a position of trust and having breached his trust, in fraud of Plaintiff, and being under obligation to fully disclose all of the assets acquired by him lawfully belonging to the community and concealed assets of the community from Plaintiff, so that upon his failure to make full disclosure, the Court should, in equity and in justice, award to Plaintiff, as her part of the community estate, all of the items of property above listed and identified by her as belonging to the community."

■ Defendant Cohrs went to trial on his Second Amended Original Answer and he lodged no exceptions to the plaintiff's pleading. "In the absence of special exception the petition will be liberally construed in the pleader's favor and to support the judgment." See Scott v. Gardner, 137 Tex. 628, 156 S.W.2d 513, pts. 1 and 2, at page 515, 141 A.L.R. 50. Commission of Appeals opinion adopted.

With reference to Item 10, plaintiff alleged substantially that she owned an undivided interest in and to the tract of property in Block 293 S.S.B.B., City of Houston, Harris County, Texas, being all of Lot 1, the East ½ of Lot 12, and portions of Lots 2 and 3 in Blocks 293 S.S.B.B. Addition, which tract is fully described in a deed from Helen Scott Sulsbury to the defendant Herman B. Cohrs dated February 1, 1946 and recorded in Vol. 1420, page 555, Deed Records of Harris County, Texas. Testimony was tendered to the effect that shortly after Cohrs acquired the property in his name, he applied for water service from the City of Houston, and that he made appli-

cation for such service in the name of William H. Scott, at that time husband of appellant, Cohrs representing Scott to be the owner and himself to be Scott's agent, and giving Scott's address as being the last place where water was used.

Testimony was further tendered to the effect that Cohrs was a married man when the property was bought and paid for, and that thereafter, in a suit for divorce which Cohrs filed against his wife, he made a written allegation in his petition to the effect that he and such wife had accumulated no community property during their marriage relationship, and evidence was further to the effect that William H. Scott, appellant's husband, was the lawyer who filed that petition in Cohrs' behalf. Testimony was tendered to the effect that appellee Cohrs made oral declarations and admissions to the witness Carl B. Ehman, to the effect that he and Scott jointly owned the property. Mr. Ehman testified to the effect that he was 76 years old and was a licensed real estate dealer in the City of Houston, and as such, he had become familiar with the value of real estate in the Harris County area; that he knew William H. Scott, husband of appellant, and Herman B. Cohrs; that in the month of January, 1953, in the lobby of the Bankers Mortgage Building in Houston, he had occasion to have a conversation with Herman B. Cohrs relative to his real estate.

"Q. What was the conversation? A. Well, we started into talking. I said to him 'What are you doing in the building all the time?' I said 'Is Bill Scott your attorney?' and he said 'Well, I guess he is my attorney in a way, but he and I have several properties together.'

"Q. And that was about January 1953? A. It may have been later than that.

"Q. Some time in 1953? A. Some time in the spring or summer.

"Q. When was it with reference to the time Mr. Scott became District Attorney? A. A month or two after, maybe three.

"Q. In the course of that conversation did Mr. Cohrs, or not, identify any particular item of property as to which he said he and Mr. Scott were joint owners? A. He mentioned the Montrose Apartments.

"Q. What did he say? A. On Clay and Caroline.

\* \* \* \* \* \*

"Q. What was the nature of your conversation with Mr. Cohrs?

\* \* \* \* \* \*

"A. I said to him 'What are you doing in the building, I see you so often, is Bill Scott your lawyer?' and he said 'No, he is not my lawyer. In a way he is, but we have several properties together, in partnership on them, and I said 'Which ones' and he said 'Well, that one down at Clay and Caroline.' I said 'That is a pretty good piece of property' and he said 'Yes, it is a good piece, I have been offered a hundred and seventy-five thousand dollars for it.'

"Q. All right. Mr. Ehman, let me ask you whether you had occasion to see Mr. Herman Cohrs in the early part of 1956 at your home here in Houston, Texas? A. Yes.

"Q. What was the occasion of your seeing him on that day at your home? A. Well, I had a female Doberman Pinscher and he had a male and he wanted to let his dog breed this female of mine and he and his wife come out and I made his wife go in the house and sit down because it was kind of nasty outside, and while we were out there he said to me 'Do you know where I can borrow eighty thousand dollars?'

\* \* \* \* \* \*

"A. I said what piece of property do you want to borrow eighty thou-

sand dollars on and he said 'The Montrose Apartments, I want to rebuild them.'

"Q. All right. On that occasion was there or not anything said with reference to the ownership of the Montrose Apartments by Mr. Cohrs? A. I asked him 'That is the piece of property you and Bill own together' and he said yes.

"Q. Bill, who did you mean? A. Bill Scott.

\* \* \* \* \* \*

"Q. Now that was early in 1956? A. Yes, sir.

"Q. That is the second occasion on which you had some conversation with him with reference to the Montrose Apartments? A. Yes.

"Q. Did you ever see him again at your home? A. Well, he come out every day for several days with his male and we would always have some conversation.

"Q. Was there any other occasion other than the first day he came out there that you had any conversation with Mr. Cohrs with reference to the ownership of the property designated as Montrose Apartments? A. Yes.

\* \* \* \* \* \*

"Q. And that was your last conversation with him about his real estate? A. No, that wasn't the last conversation with him about real estate. My last conversation was when he brought his dog to my place to breed this female I had.

"Q. When was that? A. That was in early 1956, or late in January.

"Q. Late January 1956? A. No, sir. That was December 1955 or early in January 1956.

"Q. Did he in that conversation mention any property he and Bill Scott

owned by name? A. No. That is the one he wanted to raise the eighty thousand dollars to rebuild it.

"Q. Did he in that or any other conversation that he had with you,— just answer this yes or no,—ever name or identify any other property that he and Mr. Scott owned? A. No.

"Q. Just the Montrose property was mentioned by name? A. That is all.

\* \* \* \* \* \*

"Q. You engaged in other conversation during that hour? A. Well, I asked how he was getting along and he said he was out trying to raise eighty thousand dollars to fix up this Montrose Apartments, and I said 'That is the place you and Bill Scott own together' and he said yes.

\* \* \* \* \* \*

"Q. Isn't it a fact, Mr. Ehman, that you asked Mr. Cohrs, that you told him you would get him a loan at eight per cent interest? A. No, sir, I did not. I did not.

"Q. You didn't offer to get him a loan at eight per cent? A. No, I did not. As quick as he mentioned Bill Scott wasn't going to sign the note I backed off of it. I didn't tell him why I was backing off but I told him he could get it somewhere.

"Q. And he did get it? A. Yes."

Testimony was also tendered to the effect that during the time that the marriage relation existed between appellant and her husband, William H. Scott, that Mr. Scott became infatuated with Mrs. Lou Ayres and that while he was so infatuated with her, Mr. Scott bought a yellow Cadillac car and had the title issued in the name of appellee Cohrs, but turned the car over to Lou Ayres to drive as she saw fit. Thereafter, it appears that appellee Cohrs, under Scott's direction, sold the yellow Cadillac and bought Lou

Ayres a black Cadillac, Cohrs again taking the title to the black Cadillac in his name, but delivering it over to Lou Ayres. Mrs. Scott was never told anything at all about these transactions. Testimony was also tendered to the effect that while this infatuation was going on, appellee Cohrs, in company with Mr. Scott and Lou Ayres, made two trips to Hot Springs, Arkansas. It appears that the first time Cohrs and Scott went to Hot Springs, they went together in Cohrs' automobile, and while there, met Mrs. Ayres, and it appears that all of them were guests at the same hotel. Mr. Scott and appellee and Mrs. Ayres went out to dinner several times together, and it appears that they were there about a week, when all returned to Houston, in appellee's car.

On the second trip Mrs. Ayres made the trip with Mr. Scott and appellee in an automobile, and after spending about a week in Hot Springs, Cohrs and Scott returned to Houston alone. This testimony was developed from appellee and Mr. Scott, and we think that the jury was entitled to weigh the admissions of appellee in the light of his intimacy and association with Mr. Scott, and in his willingness to join him in perpetrations of wrongs against Mr. Scott's wife.

 Much has been written by our appellate courts as to when it is proper for the trial court to grant a motion for an instructed verdict. It is our view that one of the best statements to guide the trial court in arriving at the answer to this question is found in an opinion by this court by Chief Justice Rice, in the case of Olds v. Traylor, Tex.Civ.App., 180 S.W.2d 511, at page 514, pts. 8 and 9 (Writ Ref.). There we find this statement of the rule:

"Where the facts are controverted, or are such that different inferences may be reasonably drawn therefrom, an issue of fact is raised; it is only where the evidence is harmonious and consistent, and the circumstances permit of but one conclusion, that the question becomes one of law for the determination of the court. An issue of fact is raised 'if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff.' Wininger v. Ft. Worth & D. C. R. Co., 105 Tex. 56, 143 S.W. 1150; Texas & P. R. Co. v. Cox, 145 U.S. 593, 12 S.Ct. 905, 36 L.Ed. 829; Brown v. Griffin, 71 Tex. 654, 9 S.W. 546; Texas & P. R. Co. v. Ball, 96 Tex. 622, 75 S.W. 4."

Moreover, " 'It was the jury's province to weigh all the evidence, to decide what credence should be given to the whole or to any part of the testimony of each witness. "The jury were the judges not only of the facts proved, but of the inferences to be drawn therefrom, provided such inferences were not unreasonable." ' " See Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, 195, at page 199, pt. 6.

In the early case of Briscoe v. Bronaugh, 1 Tex. 326, 327, pt. at page 340, we find this statement of the rule: "The law * * * has no scales wherein to weigh the different degrees of probability; still less to ascertain what weight of evidence shall amount to proof of any disputed fact. Its business is to define, to distinguish and to apply legal consequences to ascertain facts; but whether a fact be probable or improbable, true or false, admits of no legal definition. The law therefore refers the weight of evidence and of the different degrees of probability to the jury, who are to be guided in their decision by their conscientious judgment and belief under all the circumstances of the case. * * * And where the question is one of fact to be ascertained by the jury, from weighing the evidence and the degree of probability, the court will not interpose for the purpose of granting a new trial unless it be in order to rem-

edy some manifest error. 'Where a controversy consists chiefly of questions of fact, the objections to a verdict must be very cogent to induce the court to grant a new trial.' * * * In such a case it is not enough that it is not clear that the verdict is right; but it must clearly appear that it is wrong, to induce the court to set aside the verdict." Our Supreme Court has not departed from the above rule, and we think the principles here announced are applicable to the factual situation here, because an instructed verdict was given.

■ The record in this case is voluminous. The facts and circumstances surrounding the intimate dealings of William H. Scott and appellee Cohrs are most unusual, and the jury was entitled to take into consideration all of the testimony tendered, together with all of the surrounding facts and circumstances, in arriving at its verdict. Our view of the record here is (this being a jury trial) that no court can say that such evidence touching the relations and transactions existing between Mr. Scott and Mr. Cohrs as it affects the property in question, is harmonious and consistent with honesty and fair dealing (in so far as the appellant is concerned), and that the circumstances do not permit the trial court to conclude that these transactions were free from fraud, and that Mr. Scott and appellee Cohrs did not conspire together and place the title to the property in question in Cohrs' name for the purpose of deceiving and defrauding appellant. If appellee Cohrs had purchased the property in question with his own funds, he did so while he was married to his second wife, and he made no accounting to her of the community funds that went into the purchase of this property in his divorce proceeding with his second wife. It is without dispute that Cohrs alleged that he had no community property that was accumulated by virtue of his second marriage, and since his divorced second wife has not contested his statement to

the effect that there was no community of the second marriage, Cohrs had no one to deceive in the present transaction except Mrs. Scott, and we think the jury was entitled to take all these surrounding facts and circumstances into consideration in determining whether or not the property in question was fraudulently placed in the name of Cohrs to practice a fraud on Mrs. Scott. We think the evidence here tendered, a part of which is recited, under all the facts and circumstances, is sufficient to tender the issue of conspiracy between Scott and Cohrs with relation to the title of the property in question, and that the trial court erred in instructing a verdict in favor of appellee Cohrs.

Our Supreme Court, in the case of Johnson v. Deloney, 35 Tex. 42, pt. at page 550, made this statement of the rule:

"The witness should be tried by the light of surrounding circumstances, the motive for his evidence should be examined, any special circumstances under which he testifies, his relations to the parties, his opportunity of knowing the truth of that to which he testifies, as well as his own character for truth and veracity."

In Flack v. First National Bank of Dalhart, 148 Tex. 495, 226 S.W.2d 628, pts. 9 and 10, at page 633, our Supreme Court made this statement of the rule:

"As to the testimony of interested witnesses, the general rule is that, while the jury has no right arbitrarily to disregard the positive testimony of unimpeached and uncontradicted witnesses, the mere fact that the witness is interested in the result of the suit is deemed sufficient to require the credibility of his testimony to be submitted to the jury. Stated in another form, the rule is that the uncontradicted, uncorroborated testimony of a party to a suit will not authorize or support an instructed verdict." See cases there collated.

It is our view that under the foregoing rule, the trial court committed reversible error in giving an instructed verdict in favor of appellee Cohrs and against appellant.

■ That leads us to say that we are of the view that the quantum of proof tendered by appellant in this cause was sufficient, if believed, to establish a resulting trust in appellant's favor on the property in question. See Addison v. Ball, Tex.Civ.App., 262 S.W. 877 (er. dis.); American Freehold Land Mortgage Co. v. Pace, 23 Tex.Civ.App. 222, 56 S.W. 377 (er. ref.); Miller v. Miller, Tex.Civ. App., 285 S.W. 837; Krenz v. Strohmeir and others, Tex.Civ.App., 177 S.W. 178 (er. ref.).

■ With reference to Point 2, in which appellant contends that Cohrs admittedly joined with Scott in fraudulent acts against the community, we think the evidence is sufficient to tender an issue to the jury as to whether Mrs. Scott was damaged by reason of the transactions relating to the automobiles, part of which has been detailed. Perhaps we should say in this connection that evidence was tendered to the effect that one of the automobiles was sold for $2,500 and the money given back to Scott, although it was registered in Cohrs' name. It is true that it is not shown the exact amount of money that was paid to the dealer in Rosenberg for the second automobile that was purchased there, but in appellee's brief we find this statement:

"There was also evidence that Mr. Scott bought a Cadillac automobile for around $3,000, the title to which he put in Appellee's name in 1952, which car he kept in a garage and permitted Mrs. Ayres to drive. Later this car was sold and the $2,500 or $3,000 that was received from the sale of it was delivered to him. Still later he purchased a Cadillac jointly with Mrs. Ayres and title to this car likewise was put in Appellee's name.

He had $3,500. or $3,800. in this new automobile and that was returned to him by Appellee who obtained this money on the car by mortgaging it."

We think the testimony was such that the jury would have been warranted in finding a substantial amount of damages to the community, of which Mrs. Scott would have been entitled to one-half. Needless to say, the husband would be liable to the wife for any fraud practiced by him upon the community estate. See Fraud and Deceit, Secs. 63 and 64, Vercelli v. Provenzano, Tex.Civ.App., 28 S.W.2d 316 (no writ hist.). See also 20A Tex.Jur., Fraud and Deceit, Secs. 63 and 64. Certainly the jury would have the right to take all of these facts and circumstances into consideration in determining Cohrs' credibility when he testified to the effect that Mr. Scott had no interest in the Montrose properties.

Believing that the court erred in granting appellee's Motion for an Instructed Verdict, this cause is reversed and remanded, and the parties will be allowed to file such amended pleadings as they deem proper. Reversed and remanded.