HERMAN B. COHRS v. FRANCIS BEATRICE SCOTT.

No. A-7279. Decided June 22, 1960.
Rehearing Overruled October 5, 1960.
(338 S.W. 2d Series 127)

*Chas. A. Keilin,* of Houston, for petitioner.

*Bracewell, Reynolds & Patterson* and *Edwin I. McKellar,* all of Houston, for respondent.

MR. JUSTICE GREENHILL delivered the opinion of the Court.

Mrs. Scott sued W. H. Scott for divorce. In the accompanying dispute over their property, Mrs. Scott made Herman Cohrs a party. After Mrs. Scott had concluded the presentation of her evidence against Scott and Cohrs jointly, the court announced that he would instruct the jury to find for Cohrs. By

agreement, Mrs. Scott's cause of action against Cohrs was severed from that asserted against Mr. Scott, and separate judgments were subsequently entered. Mrs. Scott alone appealed from the judgment entered for Cohrs on the instructed verdict. At the conclusion of the evidence against Mr. Scott, it was announced that Mr. and Mrs. Scott had reached an agreement on a division of their property, subject to Mrs. Scott's claim against Cohrs. The jury was dismissed, and the court rendered judgment awarding the divorce to Mrs. Scott and dividing the property pursuant to the agreement. No appeal was taken from the judgment against Mr. Scott.

In this appeal of the judgment for Cohrs, Mrs. Scott contends that her husband secretly and fraudulently (as to her) invested community funds of the marriage of herself and Mr. Scott in an apartment building acquired in Cohrs' name. Her main point is that a resulting trust should be imposed in favor of the community in such apartment, and that she is entitled to her half interest in the benefits of such trust. She contends also that she has a cause of action against Cohrs for his participation in the allegedly fraudulent use of community funds of herself and W. H. Scott in the purchase of two automobiles for the use of a woman companion of Scott. The judgment of the trial court in instructing a verdict for Cohrs was reversed by the Court of Civil Appeals. It held that an issue of fact was raised on both of the points. 321 S.W. 2d 643. We here reverse the judgment of the Court of Civil Appeals and affirm that of the trial court.

■ The building in question was known as the Montrose Apartments in Houston. It was purchased by Cohrs on February 1, 1946. The date is important because a resulting trust for purchase money must arise at the time of the passage of title. *Morrison v. Farmer,* 147 Texas 122, 213 S.W. 2d 813; *Solether v. Trinity Fire Ins. Co.,* 124 Texas 363, 78 S.W. 2d 180.

The Scotts were married in 1923. Mrs. Scott testified that the early years of her married life were pleasant and satisfactory. This period included the year 1946 when Cohrs purchased the apartment. She said that the relations between her and her husband, Scott, were always good until 1952; that he was a devoted husband until 1952. She began to notice a change in the latter part of 1951. She then began to suspect that he was involved with another woman but did not know it was a Mrs. Lou Ayers until November of 1953.

Mr. Scott began campaigning vigorously in 1952 and was elected District Attorney of Harris County that year. He was away from home a great deal after that. Mrs. Scott went to Europe in 1953, at Scott's request, she said. Their daughter, who was with her husband then stationed in Italy, was having a baby.

Mrs. Scott relies on three circumstances, mainly, to raise an issue of fact on the resulting trust:

1. Recitals in the divorce pleadings of Cohrs in 1944 that he and his wife had accumulated no community property and his testimony that the wife got only $5,000 in settlement. This is to show that Cohrs did not have the money to make an $11,250 down-payment in 1946 on the apartment. She would then further infer that the money, or a part of it, came from Scott.

2. Statements in an application to the city for water service for the apartment listing Scott as the subscriber. Cohrs signed the application as agent for Scott.

3. Testimony of the witness Ehman that Cohrs had told him in 1953 and again in 1955 or 1956 that he (Cohrs) and Scott owned the apartment together. We will discuss each of these contentions:

(1) *The "admission" in Cohrs' divorce pleadings.*

Cohrs first met Scott in 1935. Scott represented him in a few matters as did Mr. K. C. Barclay. Cohrs had acquired the Belmont Hotel, across the street from the Montrose Apartments, before his marriage in 1935 (which would make it his separate property). Shortly after the outbreak of World War II, Cohrs went into the service and to the South Pacific. He left funds, not involved here, with Scott to be sent to his (Cohrs') mother each month.

In 1944, while Cohrs was still in the Pacific, he employed Scott to file a divorce for him in Harris County. The pleadings, which were more or less formal, alleged that the parties had accumulated no community property during the marriage. The pleadings were not sworn to and were abandoned. The suit in Harris County was dismissed at Cohrs' request, and the Cohrses were divorced in Tennessee later in 1944. Cohrs testified that his wife had full knowledge of their properties, that they made an out-of-court settlement in which Mrs. Cohrs got about $5,000,

and that his wife signed a quitclaim to his properties. His testimony in this regard was not disputed. The "no community property" statement in the abandoned pleading and the $5,000 settlement to the wife in 1944 are the items relied upon to prove Cohrs' inability to pay $11,250 on the Montrose Apartments in February, 1946.

At the time of the purchase by Cohrs, Scott was getting along well with Mrs. Scott. During this period (1946) and up until the latter part of 1951 she testified that their relations were good; that he was a devoted husband.

The apartment, as stated, was purchased by Cohrs on February 1, 1946, from Mrs. Saulsbury of Temple for $45,000. Cohrs paid $11,250 down and executed notes for the balance. The seller was represented by Mr. Byron Skelton, also of Temple, and the contract of sale was closed in his office. Cohrs was represented by Scott. There is no evidence that Scott made any of the down payment or obligated himself or the community of himself and Mrs. Scott to pay the notes. Scott swore that he had no interest in the property at any time and that he had none at the time of trial. Cohrs swore that *he,* and he alone, made the down payment and paid each note from his own funds as they came due. Cohrs and Scott both denied that they had ever been partners or joint-adventurers in any business or venture.

(2) *The "admissions" in the city water application.*

On February 2, 1946, the day following the closing of the sale of the apartment, application was made to the City of Houston for water service. The application form called for certain statements. Among those were these, with the answer given being in italic.

Name: *W. H. Scott.*

Address to be served: *1217-19 Clay* Class *RM-12.*

Occupied as: *RM-12 owned.* Owned by _____.

Occupation: *Attorney.*

Mail bill to: *c/o Belmont Hotel, 1308 Clay* [owned by Cohrs].

Last address where water was used: *2417 Riverside Dr. 159A-824* [Scott's residence].

Is Private Water Supply on Property: *No since 1936 not moving.*

The application is signed "W. H. Scott, subscriber, by H. B. Cohrs, authorized agent." The words "subscriber" and "authorizeed agent" are printed on the form. At the top of the application is printed by hand, "Letter from Mr. Scott for authority for Mr. Cohrs to sign in file." The letter was not introduced.

The city's employee who produced the application had no knowledge of its execution. He testified that the purpose of the application is to establish credit. Otherwise a deposit is required. No deposit was required of former subscribers, and Scott was a subscriber at his residence. But, as Mrs. Scott points out, so was Cohrs. He owned the Belmont Hotel across the street. And the deposit would not have been a substantial one. Mrs. Scott contends that the application is a statement by Scott of ownership and a recognition by Cohrs of Scott's ownership. Scott testified that it was an *application* for water service and nothing more; that his name is affixed as "subscriber" (not owner); and that the blank "Owned by," inquiring as to the status of the subscriber, was left blank.

(3) *The oral declarations of Cohrs to Ehman.*

Carl Ehman, called as a witness by Mrs. Scott, was 76 years of age at the time of trial. Following the filing of the divorce proceedings between the Scotts, he visited Mrs. Scott from time to time. He occasionally took her to dinner and a show. He was a real estate man and appraiser. He offered to help Mrs. Scott in this suit. After this suit was filed, he suggested to Mrs. Scott that she had an interest in the Montrose Apartments.

This suit for divorce and accounting was filed in 1955. Thereafter, around the first of January, 1956, when she and Ehman were driving home from a show, he told her about his conversations with Cohrs. Before that, she had no information or reason to believe she or the community had any interest in the Montrose Apartments.

Ehman's testimony is set out at length in the opinion of the Court of Civil Appeals. In summary, he testified that in 1953, some seven years after the purchase of the apartment by

Cohrs, he had a conversation with Cohrs in front of the elevator in the Bankers Mortgage Building. Ehman said that Cohrs told him that he (Cohrs) and Scott owned some properties together and mentioned the Montrose Apartment. Ehman could not recall any other property allegedly owned by Cohrs and Scott. In 1956, Cohrs and Ehman again met on an occasion which had nothing to do with this case except that Ehman said Cohrs then inquired whether he, Ehman, knew where Cohrs could borrow $80,000 to fix up the Montrose Apartments. Ehman said, "That is the place you and Bill Scott own together, and he said 'yes'." "I asked him if Bill [Scott] was going to sign the note and he said 'no,' and so I told him I didn't know where he could get it." "As soon as he mentioned Bill Scott wasn't going to sign the note I backed off it."

Cohrs denied making the statements. After acquiring the Montrose Apartments in 1946, he managed them himeelf. He and Scott testified that Scott never lived there and that Scott did not have anything to do with their management or control. Against Scott's advice, Cohrs in 1949 executed a 99-year lease on the apartment. The lease was prepared for Cohrs by Vinson, Elkins, Weems & Searls. The lessee failed to keep the premises in good repair. So Cohrs took them back in 1955 and has operated them since that time. In February, 1956, Cohrs borrowed $45,000 from the Bank of the Southwest to recondition and improve the apartment building, and its name was changed to the Clay Hotel. Cohrs executed a mortgage on the premises to secure the obligation. Only Cohrs was obligated on the notes. Cohrs received and paid income tax on all of the income from the apartment. None of the income went to Scott.

Mrs. Scott further relies on Cohrs' capacity to deal secretly with Scott against her interest in relation to the purchase of cars for Mrs. Lou Ayers, as will be set out later.

■ A resulting trust arises by operation of law when title is conveyed to one person but the purchase price or a portion thereof is paid by another. The parties are presumed to have intended that the grantee hold title to the use of him who paid the purchase price and whom equity deems to be the true owner. The trust arises out of the transaction and must arise *at the time when the title passes. Morrison v. Farmer*, (1948) 147 Texas 122, 213 S.W. 2d 813.

■ Under all the circumstances, we think that the evidence presented by Mrs. Scott raises no more than a surmise or sus-

picion. It does not arise to "some evidence" that funds of Mr. and Mrs. Scott went into the purchase of the Montrose Apartments. The trial court therefore correctly directed a verdict for Cohrs in this matter. *Joske v. Irvine* (1898), 91 Texas 574, 44 S.W. 1059; *Norton v. Clarks* (1960), 160 Texas 466, 333 S.W. 2d 108.

We have been cited to no cases with similar fact situations and have found none. But we regard the following cases as supporting this holding.

In *Wright v. Wright*, (1939) 134 Texas 82, 132 S.W. 2d 847, Moore deeded Wright 300 acres of land for $1,500. The down payment was $600. Wright's son alleged that it was agreed that title would be taken in the father's name, but that the father would hold the south 100 acres for the son. The jury found there was such an agreement. It was held that there was no evidence to support a resulting trust because assuming that there was evidence that some money of the son went into the consideration given, there could be no pro tanto trust established because it was not established what part of the purchase money was furnished by the son.

In *McCombs v. Abrams*, McCombs and Abrams purchased 1600 acres with a down payment and notes. McCombs was unable to keep up the payments on his one-half interest; so he deeded the land to Abrams who then deeded 100 acres back to McCombs. In a contest over title to the 100 acres, the heirs of McCombs' wife quoted McCombs as making oral declarations that at the time of the purchase, he was buying the land with her funds and for her benefit. It was held that there was no evidence to support a parol trust: "* * * there is no showing that one dollar of Mrs. McCombs' money was in fact used in part payment for the land." (Texas Civ. App. 28 S.W. 584, at 588, 1930, opinion adopted by the Commission on Appeals, 48 S.W. 2d 612.)

In *Murphy v. Cartwright*, 202 F. 2d 71 (5th Cir. 1953), the son, executor of the estate of his deceased father, claimed that he, the son, owned a half interest in land which stood in the father's name; that the two operated their business as an informal partnership; and that the land had been purchased with proceeds of the sale of cattle. In the first inventory the son filed, he listed the land as belonging to the father. He later filed an amended inventory claiming the half interest. In the trial, the son produced a witness who testified that on two

occasions, the witness had asked the father why he did not convey a portion of his property to the son. On both occasions he was told, in effect, that the son already owned "half of it." The circuit court set aside a decision for the son and directed the entry of judgment denying the parol trust:

"It is well settled in Texas that the * * * record owner of property is presumed to be the true owner thereof, and one who asserts that such ownership is burdened with a parol trust has the burden of establishing the trust by clear, satisfactory and convincing proof. [citing cases].

"* * *

"In any event, there is no evidence that when the property was acquired * * * that it would be held subject to appellee's [the son's] claimed interest therein, or that subsequent to his acquisition of the property, Thomas J. Cartwright [the father] took any action or made any statement which could rise to the dignity of a conveyance, actual or constructive. We conclude that appellee [the son] did not sustain the burden of proving his asserted interest in the property." 202 F. 2d at 74.

See also Jones v. Siler (1937), 129 Texas 18, 100 S.W. 2d 352.

Counsel for Mrs. Scott in their able brief cite several opinions by the Courts of Civil Appeals which contain oral admissions by the alleged trustee and in which a resulting trust has been imposed. We regard the direct evidence of the creation of a trust to have been stronger in those cases. Among those cited by counsel for Mrs. Scott are these:

*Miller v. Miller,* (1926), 285 S.W. 837, writ dis. w.o.j. There a husband and wife operated a cafe. The husband sold it, deposited the funds in the bank, and then purchased land in the name of his brother who lived in Ohio. In a suit over the land, it was proved that the brother never saw the land and paid no taxes on it. A daughter swore that the Ohio brother made the oral statement to her that he had nothing to do with the matter, that it was the father's idea. The Ohio brother, on the trial, swore he purchased the land; but a bank teller testified that the husband paid the installments from his bank account in which the proceeds of the cafe had been deposited. It was held that there was evidence to support a finding of a resulting trust.

In *Addison v. Ball,* 1924, 262 S.W. 877, writ dismissed, land

was purchased by Ball partly with money furnished by Addison or Addison's bank. The question was whether it was a loan or an investment by Addison in Ball's purchase. Testimony was introduced that Ball had made several oral declarations that he and Addison were partners. Ball did not deny the statements. Both Ball and Addison had made written statements showing a partnership. After Addison's death, Ball had attempted to persuade Mrs. Addison to put up an additional $500 to pay a note due on the land. It was held that the evidence supported a finding of a resulting trust.

*Pearce v. Dyess*, 1907, 45 Texas Civ. App. 406, 101 S.W. 549, writ refused, is the case which is probably nearest in point for Mrs. Scott. A husband and wife accumulated a substantial amount of community property. He died and the wife remarried. The second husband had no property at the time of the marriage. He purchased the land in question allegedly with funds of the community of his wife's first marriage and made oral declarations to that effect. He then moved onto the land. In a suit by the children of the first marriage, it was held that the evidence supported the imposition of a trust. In the case now before the Court, the husband did not go into possession, denied investing any funds whatsoever, and disclaimed any interest in the apartment, community or otherwise. Counsel for Mrs. Scott emphasizes the fact that in the *Pearce* case, the second husband had no funds of his own when he purchased the land. He then refers to the fact that Cohrs said, in his divorce pleadings in 1944, that he and his wife had no community property. We do not regard that as proving that he could have had no funds in 1946 to make the down payment on the Montrose Apartments or that Scott furnished all or a part of the consideration. It will be remembered that Cohrs owned the Belmont Hotel as his separate property.

Assuming *Johnson v. Deloney*, 35 Texas 42 (by the semicolon court), cited by Mrs. Scott, to be authoritative, it holds that oral declarations by an alleged trustee who was dead at the time of trial were admissible. No point is made here that Cohrs' alleged statements to Ehman were not admissible.

(4) *The purchase of the automobiles for Mrs. Ayers.*

Mrs. Scott seeks recovery of damages against Cohrs for his participation in the purchase by Scott of two cars for Mrs. Ayers. The first car, a yellow Cadillac, was purchased by Scott in 1951 for $3,000 or "maybe a little more." He did not tell Mrs.

Scott of its purchase but allowed Mrs. Ayers, who had been convicted of operating a bawdy house in 1950 or 1951, to use it. In 1952, when he began to campaign for district attorney, he had the title transferred to Cohrs with Cohrs' consent. The yellow Cadillac was sold by Cohrs at Scott's direction in 1953 for around $3,000. Mrs. Ayers had picked out a black Cadillac and had made a down payment on it. Scott paid the balance in cash in the presence and with the assistance of Cohrs. Cohrs did not know what the purchase price was, but title was taken in his name. Scott testified that he "had $3,500 to $3,800" in the Cadillac. Mrs. Ayers drove this car also without the knowledge of Mrs. Scott. In 1954, Cohrs at Scott's direction mortgaged the black Cadillac and turned the money over to Scott. Scott said he got $3,800 which "practically put me back where I was on the car." Cohrs said the amount was $3,500. The record is silent as to what happened to the black Cadillac or its mortgage thereafter, and Mrs. Scott does not seek recovery of the car. She seeks only damages from Cohrs. He never had possession or use of either of the cars.

Assuming a fraud, we are unable to find injury to Mrs. Scott or to the community estate. After the above evidence had been developed, Mrs. Scott entered into an agreement with Mr. Scott for an amicable division of their community estate, and judgment was entered thereon. This judgment, from which no appeal was taken, is presumed to have equitably adjusted and divided the estate of the spouses, taking into consideration all claims and counterclaims between them. Under that agreement and judgment, Mrs. Scott received substantial properties and Mr. Scott was left with substantial properties. Beyond any question, as between Scott and Cohrs, Scott was the principal actor as to Mrs. Ayers, the automobiles furnished her, and the fraud on Mrs. Scott.

There are cases which say that where a husband perpetrates a fraud upon the wife by the making of excessive gifts of community property to third persons with a fraudlent intent, she is entitled to recover against the property of the husband and against third possessors.[1] But under the facts before us, the fraud having been initiated and carried out mainly by the hus-

1.—This is the dictum of Chief Justice Hemphill in *Stramler v. Coe*, 15 Texas 211 (1855). It is used by de Funiak in 1 *Principles of Community Property* 351 to place Texas in line with a majority of states which so hold. See also Speer, *Law of Marital Rights in Texas* 203, supporting this view, and Annotations, "Gift of Community Property," 7 A.L.R. 2d 1118, and "Gift by Husband as Fraud on Wife," 49 A.L.R. 2d 521, at 576. W. O. Huie in "Community Property Law as Applied to Life Insurance," 18 Texas Law Rev. 121, at 123 and 128, traces Hemphill's statement into the Spanish and Mexican law through Escriche's *Diccionario*.

band, she must look primarily to him and his property to right the wrong. The trial court here, in dividing the commuiity property, and the parties in agreeing to such settlement, presumably compensated Mrs. Scott for any loss she may have suffered on the purchase and disposition of the Cadillacs.

This holding makes unnecessary serious questions as to whether the pleadings of Mrs. Scott would support a judgment as to automobiles as a separate item of recovery.

The judgment of the Court of Civil Appeals is reversed, and the judgment of the trial court is affirmed.

Opinion delivered June 22, 1960.

Rehearing overruled October 5, 1960.