Opinion issued October 31, 2024



In The

# Court of Appeals

For The

## First District of Texas

_____

### NO. 01-22-00529-CV

_____

**QIONG-YING DUANG CHANG, INCAPACITATED, Appellant**

**V.**

**QINGHUA "JULIA" LIU, AS ADMINISTRATOR OF THE ESTATE OF HSIANGPIN "MICHAEL" CHANG, Appellee**

---

On Appeal from the 10th District Court
Galveston County, Texas
Trial Court Case No. 19-CV-2082

---

## MEMORANDUM OPINION

Qinghua "Julia" Liu, widow and administrator of the estate of Hsiangpin "Michael" Chang, brought suit to quiet title, for trespass to try title, and for a declaratory judgment seeking to establish the supremacy of the title to a house in Galveston County, Texas. Michael had purchased the house and put the title in the

name of his mother, Qiong-Ying Duang ("QYD") Chang, who lived in China at the time.[1] A jury found that Michael paid the purchase price for the property and that he did not intend for it to be a gift to his mother at the time of purchase. The trial court rendered judgment on the verdict, holding that Michael's estate had a purchase-money resulting trust in the property and that the estate's right to the property was superior to QYD's.[2]

QYD appealed. She raises four issues on appeal. First, she argues that Michael's estate should be held to have forfeited the property because he put the title in his mother's name while divorcing his first wife, Vicky. Second, she argues that the trial court erred by denying admission of evidence that QYD maintains demonstrated Michael's intent either to hide the asset from Vicky or to give the property to his parents as a gift. Third, QYD argues that the trial court erred by not submitting a question or instruction to the jury regarding whether Michael's alleged "unclean hands" or violation of public policy precluded his estate's recovery. Fourth, QYD argues that the evidence is legally and factually insufficient

---

[1] It is undisputed that the QYD was incapacitated due to memory loss when this lawsuit was filed and ever since. QYD was initially represented by Peter J. Bennett as temporary guardian of the estate and person of QYD. When Bennett ceased to be QYD's guardian, QYD's daughter, Li Chang, stepped in to represent her as next friend, asserting that there was no conflict of interest with her mother as to the substance of this case. Although the matter of QYD's guardianship was separately contested, in this appeal, no party has raised any legal challenge to Li Chang's serving as next friend to her mother.

[2] Julia did not seek attorney's fees, and none were awarded.

2

to support the jury's verdict that Michael did not intend the house to be a gift to his mother.

We affirm.

## Background

QYD is the mother of Michael Chang and Li Chang and the mother-in-law of Julia. In 2009, Julia met Michael, who was married to Vicky. Despite the marriage, Michael and Julia were living together as early as 2011. In 2012, Michael and Vicky began divorce proceedings. Around then, Michael began introducing Julia to people as his "future wife."

On September 30, 2013, Michael purchased a home at 21 Fleming Street in HarborWalk, a subdivision in Galveston County. Michael placed title to this house in the name of his mother, QYD. In August or September 2014, Michael and Vicky's divorce became final, and in October 2014, Michael and Julia married. Michael died in December 2016. In February 2017, QYD signed a deed transferring 21 Fleming to Julia. Three months later, Julia became the administrator of Michael's estate.

QYD is incapacitated due to dementia, and, since Michael's death, she has lived with her daughter Li Chang and Li's boyfriend, Bin Xu, who help care for her. In September 2019, Peter Bennett, acting as the temporary guardian of QYD's person and estate, filed suit against Julia asserting that 21 Fleming is part of

3

QYD's estate. Two months later, Julia, acting in her capacity as the administrator of Michael's estate, sued QYD through her temporary guardian,[3] asserting that QYD's earlier lawsuit was a cloud on the title to 21 Fleming. Julia pleaded claims for a suit to quiet title, a declaratory judgment, and trespass to try title. Julia maintained that Michael had a purchase money resulting trust in 21 Fleming because he never intended the property to be a gift to QYD.

The case was tried to a jury. Four witnesses testified: (1) Carrie Blachford (the real estate agent who sold the house in HarborWalk), (2) Julia, (3) Li, and (4) Li's boyfriend, Bin Xu.

Blachford testified that Michael reached out to her because he was interested in purchasing property in the HarborWalk community for family gatherings and for entertaining business clients. Michael was particularly interested in the community because of its proximity to Galveston Bay and his interest in fishing. Blachford's office at HarborWalk was near the dock where residents gathered recreationally, and, after Michael bought the house, she saw him near the dock about twice a month. Michael frequently attended community events with his family, and he became an unofficial photographer for the community. Blachford testified that she had met Julia, as well as Michael's children, but she never met Li or QYD.

---

[3] When the temporary guardianship expired, Li Chang, QYD's daughter and sole surviving child appeared as QYD's next friend.

4

Like Blachford, Julia testified that Michael bought 21 Fleming because he wanted a vacation house to share with family and clients and because he loved fishing. Julia accompanied Michael to the bank where he obtained a check for $408,095 to buy the house. Julia said that the money used to buy the property belonged to Michael, and QYD did not contribute any money toward the purchase of 21 Fleming. Julia said that QYD did not participate in the purchase of the house in any way.[4] Julia testified that Michael paid for the furnishings, utilities, maintenance, landscaping, fishing lights, repairs, taxes, cable, and internet connectivity at the house.

Julia testified that QYD visited the house once but did not spend the night and never went to the house without her and Michael. Julia also said that nobody used 21 Fleming without Michael's permission. She did not recall Michael giving Bin Xu a key to the property, and she did not recall Li and Bin Xu visiting more than a couple of times when she and Michael were there.

---

[4] Julia said that QYD lived in the United States on two occasions. First, in 1989, QYD and her husband (Michael's father) came to the United States and lived with Michael and Vicky to help them care for their then-young children, Michelle, Sunny, and Tina. QYD and her husband eventually returned to China, but after Michael's father died in 2015, QYD came to the United States and lived with Michael and Julia. On each occasion, Michael paid for QYD's living and medical expenses. Julia said that when QYD began living with her and Michael, QYD was in good health, helped with chores, took walks, and played mah jong. Julia said that in June 2018, Li and her lawyer informed her that QYD had dementia.

Julia testified that Michael put the house in QYD's name during "a special period" when "Michael and his ex-wife were going through a divorce."[5] She said that she was not aware that the house was meant to be a gift to anyone or repayment for a debt. Julia became familiar with Michael's business, finances, and assets after she was appointed administrator of his estate. Based on the paperwork she saw, Julia denied that Michael owed his mother any money. QYD did not ask any questions about the house before Michael died. Julia first informed QYD that 21 Fleming was in her name after Michael died.

Li testified that she was Michael's sister and the only surviving child of their parents. She testified that she and Bin Xu cared for QYD, who lived with them. Li said that QYD was living with Michael and Julia before Michael died, and, during that time, QYD sometimes stayed with her on the weekends. She testified, however, that Michael gave her a key to 21 Fleming, and she and Bin Xu spent time there without Michael and his family on three occasions. Li also said that Michael gave her the security password and was contacted by security each time she accessed the property.

Li testified that she had worked for Michael's business doing quality control and order fulfillment until Michael's daughter, Tina, who worked for the company, terminated her in June 2017. Li had no contemporaneous knowledge about the

_____

[5]    At the time of trial, both Michael and his first wife, Vicky, were deceased.

purchase of 21 Fleming. She testified that she never had any conversations with Michael or anyone else about who owned 21 Fleming. She testified that she learned in 2017 why Michael had put the title in QYD's name, but she was impeached with prior inconsistent testimony in which she said she did not know why he did that.

Li testified that she found documents in her parents' house in China, written in Chinese and English and signed by her parents, indicating that they had invested in Michael's business. Although the documents were not disclosed during discovery, the trial court admitted them into evidence. The documents make no mention of 21 Fleming.

Bin Xu testified that he never saw QYD at 21 Fleming. He said he was not involved with the purchase, and he did not know who paid for or furnished the property.

In her live pleading, the second amended answer, QYD asserted several affirmative defenses, including satisfaction and accord regarding a debt Michael allegedly owed her, that the property was a gift, and that a purchase money resulting trust violated public policy regarding both fraud against a marital estate and financial abuse or exploitation of senior and incapacitated citizens. At the charge conference, QYD's counsel made two objections. First, he objected to the use of the words "Galveston County Property" instead of specifying 21 Fleming.

The trial court pointed out that the term "Galveston County Property" was defined as 21 Fleming. Second, he requested that the court submit a question to the jury inquiring whether Michael intended to create a purchase money resulting trust. The trial court overruled the objection, stating that the existence of a purchase money resulting trust was a legal conclusion that would be based on the jury's fact finding about whether Michael intended the house to be a gift to QYD.

The jury found that Michael paid the purchase price for 21 Fleming in September 2013. The jury also answered "yes" to the question: "Do you find by clear and convincing evidence that [Michael] did not intend to gift the Galveston County Property to QYD at the time of the purchase of the Galveston County Property?"

QYD filed a motion for judgment NOV and a motion for new trial. In both motions, she argued that, as a matter of law, Michael's estate could not have superior title based on a purchase money resulting trust due to the doctrine of fraud on the community. QYD reasoned that because Michael and Vicky, both of whom were deceased by the time of trial, were going through a divorce when Michael bought 21 Fleming, Vicky was a creditor and Michael's action of putting title to the property in QYD's name was an action to defraud a creditor. The trial court denied both motions and granted judgment on the verdict.

The trial court rendered judgment providing that: (1) QYD has "no interest, title, or right to 21 Fleming"; (2) Julia's rights to 21 Fleming, as administrator of Michael's estate, are superior to QYD's "rights, if any"; (3) any claims by QYD are invalid and unenforceable; (4) a notice of lis pendens recorded in the Galveston County Real Property Records is cancelled; (5) title is quieted in Julia, as administrator of Michael's estate, and (6) Julia, as administrator of Michael's estate has a purchase money resulting trust in 21 Fleming. No attorney's fees were sought, and none were awarded.

QYD appealed.

## Analysis

QYD raises four issues on appeal. In the first and fourth issues, QYD argues that the trial court erred by rendering judgment that Julia, as administrator of Michael's estate, had a purchase money resulting trust in 21 Fleming because Michael committed fraud on the community (issue 1) and because the evidence was legally and factually insufficient to support the jury's verdict that Michael did not intend to gift 21 Fleming to QYD (issue 4). In the second issue, QYD asserts that the trial court reversibly erred by excluding evidence at trial. In the third issue, QYD asserts that the trial court erred by not submitting to the jury a question or instruction regarding whether Michael had clean hands or his actions "violated public policy and common law."

9

**I.**     **QYD did not demonstrate that the trial court abused its discretion in its evidentiary rulings. (Issue 2)**

In her second issue, QYD argues that the court erred by denying admission of three types of documents: (1) a deed to a second property in HarborWalk that Michael bought and put in QYD's name; (2) the mediated settlement agreement in Michael's divorce from Vicky; (3) emails that Michael sent to Vicky, which QYD maintains would have shown that 21 Fleming was omitted from the property division. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005).

**A.     The deed.**

The trial court excluded the deed, offered as Exhibit 31, on the basis that it was responsive to a discovery request but was not produced. QYD's brief does not address the trial court's reason for exclusion of the evidence. Without citation to the record, the appellant's brief says only, "The deeds were self-authenticating and relevant and were public records equally available to the Estate and most likely in the Estate's possession."

Texas Rule of Civil Procedure 193.6 provides the consequences for a party's failure to timely respond to written discovery:

> **(a)     Exclusion of evidence and exceptions.** A party who fails to make, amend, or supplement a discovery response, including a required disclosure, in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a

10

named party) who was not timely identified, unless the court finds that:

(1)     there was good cause for the failure to timely make, amend, or supplement the discovery response; or

(2)     the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.

**(b)     Burden of establishing exception.** The burden of establishing good cause or the lack of unfair surprise or unfair prejudice is on the party seeking to introduce the evidence or call the witness. A finding of good cause or of the lack of unfair surprise or unfair prejudice must be supported by the record.

TEX. R. CIV. P. 193.6.

The record in this case does not include evidence of good cause for QYD's failure to timely make, amend, or supplement the discovery response with the deed. It also does not include evidence that QYD's failure to timely make, amend, or supplement the discovery response with the deed would not have unfairly surprised or unfairly prejudiced Julia. The record does not show that QYD met her burden of establishing the admissibility of the deed. On appeal, she has not demonstrated that the trial court abused its discretion by excluding the deed. *See J.P.B.*, 180 S.W.3d at 575.

**B.     The mediated settlement agreement**

QYD offered for admission a mediated settlement agreement, Exhibit 7, which she asserted was a public document that was part of the final judgment in

11

Michael's divorce from Vicky. At trial, there was a bench conference among the court and the lawyers, regarding the admissibility of the mediated settlement agreement and whether it had been attached to the final judgment of divorce and incorporated by reference. The trial court indicated that that the document could be admissible if QYD produced evidence that the document had been made a public record. The following day, QYD asked the trial court to take judicial notice of the mediated settlement agreement. The trial court declined.

To preserve error concerning an exclusion of evidence, the complaining party "must actually offer the evidence and secure an adverse ruling from the [trial] court." *Jennings v. Martinez*, No. 01-17-00553-CV, 2018 WL 5071031, at *3 (Tex. App.—Houston [1st Dist.] Oct. 18, 2018, no pet.) (mem. op.) (quoting *Akukoro v. Akukoro*, No. 01-12-01072-CV, 2013 WL 6729661, at *6 (Tex. App.—Houston [1st Dist.] Dec. 19, 2013, no pet.) (mem. op.)); *see* TEX. R. APP. P. 33.1(a) (requiring ruling on objection, request, or motion to preserve error for appeal); *see also Benson v. Chalk*, 536 S.W.3d 886, 895 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (holding that party's complaint on appeal must comport with objection made in trial court).

QYD did not secure a ruling on her offer of the mediated settlement agreement in the trial court. On appeal, she makes no argument about the trial

court's denial of her request for the court to take judicial notice of it. This part of this issue is not preserved for review.

### C. Emails

QYD offered for admission three emails sent from Michael's email account. The trial court denied admission based on hearsay and relevance, saying the emails were "full of all kinds of extraneous stuff, and it's not related to 21 Fleming Street." The emails do not appear in the appellate record, but QYD asserts in her brief that they "would have shown that [Michael] had given two houses to his parents, that he was indebted to his parents, and he considered the assets in their name, their property."

We do not consider whether evidence was erroneously excluded unless the complaint has first been preserved for review. *McInnes v. Yamaha Motor Corp., U.S.A.*, 673 S.W.2d 185, 187 (Tex. 1984). To preserve error concerning an exclusion of evidence, the complaining party "must actually offer the evidence and secure an adverse ruling from the [trial] court." *Jennings*, 2018 WL 5071031, at *3. "Although the reviewing court may sometimes be able to discern from the record the general nature of the evidence and the propriety of the trial court's ruling, it cannot, without an offer of proof, determine whether exclusion of the evidence was harmful." *Id.*; *see* TEX. R. EVID. 103(a) (providing that party must make offer of proof outside jury's presence to preserve error regarding excluded

evidence). QYD did not make an offer of proof in the trial court. This part of this issue is not preserved.

We overrule this issue.

**II.    QYD waived error regarding the jury charge by failing to object or request an instruction as to a relevant factual matter. (Issue 3)**

In her third issue, QYD asserts that the trial court erred by not submitted a jury issue or instruction about whether "Michael Chang violated public policy or had unclean hands when he placed title to 21 Fleming in QYD's name."

We review a complaint about charge error for an abuse of discretion. *See Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 727 (Tex. 2016). "A party preserves error by a timely request that makes clear—by words or context—the grounds for the request and by obtaining a ruling on that request, whether express or implicit." *Browder v. Moree*, 659 S.W.3d 421, 423 (Tex. 2022); *see State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) ("There should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling."); *see also* TEX. R. CIV. P. 272 (providing that, to preserve error for appeal, party must object to court's charge in writing or by dictation on record before charge is read to jury); TEX. R. CIV. P. 273 (providing that parties may submit requests for questions, definitions, and instructions to be given to jury).

14

After the close of evidence, and outside the presence of the jury, Julia's counsel moved for directed verdict on QYD's affirmative defenses of laches, equitable estoppel, public policy, unclean hands, and setoff. Julia's counsel argued that there was no evidence of QYD's detrimental reliance or change of position based on Michael having put title to 21 Fleming in her name, which, he argued, was a common element to the affirmative defenses. In addition, counsel argued that those affirmative defenses are not recognized as defenses to Julia's causes of action. Finally, counsel also sought a directed verdict on QYD's claim for breach of fiduciary duty, which counsel characterized as an affirmative defense "to which there's been no evidence whatsoever."

In this context, the parties argued about the "public policy" and "unclean hands" affirmative defenses, specifically whether they were appropriate defenses to Julia's causes of action to establish supremacy of title to property, whether they were fact questions or legal questions for the court, whether any evidence had been adduced to support submission of either defense to the jury, and how to submit these defenses to the jury. One of QYD's attorneys suggested:

> Could we use unclean hand[s] instead and cite it? Because this will be a jury question: Whether or not Michael Chang intended to defraud in order to put this property in the name of QYD.
> So, it's a jury question. It's not as a matter of law. It is–it has to be decided if there was a fraud or fraud basis for unclean hand[s].

Julia's counsel responded that unclean hands is not applicable to Julia's causes of action, and, furthermore, the doctrine of unclean hands applies only when the wrong was done to the defendant, i.e., QYD, not a third party, like Vicky.

The court granted the directed verdict as to the affirmative defenses of set off and breach of fiduciary duty, but said: "I'm going to hold off on public policy until we get a little bit further. Same as equitable estoppel. I think that one is a little easier, if there hasn't been a change for the worse by QYD. So, we'll think about it."

The next day, the trial court held a formal charge conference on the proposed jury charge. The charge did not include a question regarding public policy or unclean hands. Instead, the only questions in the court's proposed charge inquired about whether Michael paid for 21 Fleming and whether Michael "did not intend to gift" 21 Fleming to QYD. QYD's counsel did not object to the omission of questions or instructions regarding the affirmative defenses of public policy or unclean hands. Instead, QYD's counsel asked the court to submit a question to the jury inquiring whether Michael intended to create a purchase money resulting trust. The trial court overruled the objection, stating that the existence of a purchase money resulting trust was a legal conclusion that would be based on the jury's fact finding about whether Michael intended the house to be a gift to QYD. QYD did

not object to the omission of fact questions related to her public policy or unclean hands affirmative defenses. Accordingly, she did not preserve this issue for appeal.

We overrule the third issue.

## III. The evidence is legally and factually sufficient to demonstrate the existence of a purchase money resulting trust. (Issue 4)

In her fourth issue, QYD argues that the evidence was not legally and factually sufficient to support the jury's verdict that Michael did not intend to give the house to her as a gift. The parties agree that Julia had the burden to prove the elements of a purchase money resulting trust, including that Michael did not intend the house to be a gift.

### A. Purchase money resulting trusts

"It has long been the law in Texas that [w]hen title to property is taken in the name of someone other than the person who advances the purchase price, a resulting trust is created in favor of the payor." *Tricentrol Oil Trading, Inc. v. Annesley*, 809 S.W.2d 218, 220 (Tex. 1991); *Nolana Dev. Ass'n v. Corsi*, 682 S.W.2d 246, 250 (Tex. 1984); *Cohrs v. Scott*, 338 S.W.2d 127, 130 (Tex. 1960); *Morrison v. Farmer*, 213 S.W.2d 813, 815 (Tex. 1948). A purchase money resulting trust is implied in law when someone other than the person in whose name title is taken pays the purchase price of the property. *Nolana Dev. Ass'n*, 682 S.W.2d at 250; *Amador v. Berrospe*, 961 S.W.2d 205, 07–08 (Tex. App.—Houston [1st Dist.] 1996, pet. denied). A purchase money resulting trust arises, if at all, out

17

of the transaction and when the title passes. *Cohrs*, 338 S.W.2d at 130. In a purchase money resulting trust scenario, "[t]he parties are presumed to have intended that the grantee hold title to the use of him who paid the purchase price and whom equity deems to be the true owner." *Id.*

"Although a resulting trust may be shown by proof that another paid the purchase price, there is an exception to this rule when parents pay the purchase price for the property and place title in the name of their child, and vice-versa." *Amador*, 961 S.W.2d at 207–08. *But see Chang v. Liu*, No. 05-20-00977-CV, 2022 WL 17175006, at *8 (Tex. App.—Dallas Nov. 23, 2022, no pet.) (mem. op.) (determining ownership of Dallas County property purchased by son and titled in mother's name, and quoting Restatement (Third) of Trusts § 9 (2003) (comments *b* and *c*) for proposition that "[t]he predominant view . . . does not support the inference of gift . . . where the transferee is a parent of the payor"). "In this situation, a presumption of gift arises, and no resulting trust exists until the presumption is rebutted." *Amador*, 961 S.W.2d at 207.

This presumption may be rebutted by clear and convincing evidence of facts and circumstances existing at the time of the transaction from which the alleged purchase money resulting trust arises, which demonstrates that the purchaser intended to retain a beneficial interest in the property. *Id.* at 208. Clear and convincing evidence is the measure or degree of proof that will produce in the

mind of the factfinder a firm belief or conviction as to the truth of the allegations sought to be established. *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010).

**B.     Standards of review**

On legal sufficiency review of a finding where a clear and convincing evidence standard applies, we consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *K.E.W.*, 315 S.W.3d at 20. We resolve disputed fact questions in favor of the finding if a reasonable factfinder could have done so, and we disregard all contrary evidence unless a reasonable factfinder could not have done so. *City of Keller v. Wilson,* 168 S.W.3d 802, 817 (Tex. 2005).

On a factual sufficiency review of a finding where a clear and convincing evidence standard applies, we consider the entire record, giving due consideration to evidence that the factfinder could reasonably have found to be clear and convincing, and determining whether a reasonable fact finder could not have resolved disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)).

We remain mindful of the role played by the jury because under any standard of review, the factfinder is the sole judge of the credibility of witnesses and the weight to give their testimony. *City of Keller*, 168 S.W.3d at 819.

### C. The evidence was legally and factually sufficient to support the jury's verdict.

On appeal, QYD argues that the evidence is legally and factually insufficient to support the jury's verdict that Michael did not intend to give 21 Fleming to her as a gift. She argues that the evidence showed that Michael paid for her living and medical expenses when she lived in the United States. She also argues that because Michael cared for her, he knew she had Alzheimer's and that her future care would be costly.

In making this argument, QYD ignores much of the evidence admitted at trial. Both Blachford and Julia testified about Michael's motivation for purchasing the 21 Fleming house. Both said that he enjoyed fishing and liked the proximity to Galveston Bay. Both said that he was looking for a property to be a vacation home or second home where his family could spend time together making memories. Both testified that he also wanted to use the property to entertain his business clients. Julia testified that she accompanied Michael to the bank where he withdrew the money to buy the property.

In addition to evidence about Michael's motivation when he bought 21 Fleming, other evidence showed that he did use the property the way that he intended. Michael paid to furnish and maintain the home, went there often with his family, participated in community activities (including fishing), and allowed other relatives to stay there.

20

On appeal, as in the trial court, QYD argues that by placing title to 21 Fleming in her name, Michael gifted the property to her. "A gift is a voluntary transfer of property to another made gratuitously and without consideration." *Seitz v. Seitz*, 608 S.W.3d 272, 277 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (citing *Magness v. Magness*, 241 S.W.3d 910, 912 (Tex. App.—Dallas 2007, pet. denied)). To establish the existence of a gift, the party must prove three elements: (1) intent to make a gift; (2) delivery of the property; and (3) acceptance of the property. *Seitz*, 608 S.W.3d at 277; *Magness*, 241 S.W.3d at 912. A party establishes the requisite donative intent by, among other things, presenting "evidence that the donor intended an immediate and unconditional divestiture of his or her ownership interests and an immediate and unconditional vesting of such interests in the donee." *Seitz*, 608 S.W.3d at 277 (quoting *Gomer v. Davis*, 419 S.W.3d 470, 476 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (emphasis omitted) (citations omitted)).

The jury was asked: "Do you find by clear and convincing evidence that [Michael] did not intend to gift [21 Fleming] to QYD at the time of purchase of [21 Fleming]?" The jury answered, yes, finding that Michael did not intend to give 21 Fleming to QYD. The evidence that Michael intended to use 21 Fleming with his family and clients supports this finding.

No evidence supports a finding that Michael intended to give this specific property to QYD. Neither Blachford nor Julia, who were with Michael when he bought the house, testified that he expressed any intention to give the house to his mother. Michael's sister Li conceded that she had no contemporaneous knowledge about the purchase of 21 Fleming. Li also testified that she never had any conversations with Michael or anyone else about who owned 21 Fleming. Li's boyfriend, Bin Xu, said he was not involved in the purchase and did not know who paid for or furnished 21 Fleming. In addition, although QYD had lived with Michael and Julia after Michael bought 21 Fleming, Bin Xu never saw QYD at 21 Fleming. Julia testified that QYD had been to 21 Fleming once but did not stay overnight. Julia also said that QYD never asked questions about 21 Fleming before Michael died, and Julia told QYD that Michael had put the property in her name only after he died. Li testified that she knew why Michael put the property in their mother's name, but she was impeached on cross-examination with prior inconsistent testimony. Li also testified that some papers in parents' home in China demonstrated that Michael owed them money. But the papers did not include any information relating to 21 Fleming.

None of this evidence shows that Michael intended to give 21 Fleming to QYD at the time he purchased it. To the contrary, the evidence at trial showed that Michael intended to keep 21 Fleming as his own, and after the purchase he actually

did keep 21 Fleming as his own. Considering all the evidence in the light most favorable to the jury's finding, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Michael did not intend to gift 21 Fleming to QYD. *See K.E.W.*, 315 S.W.3d at 20. We hold that the evidence is legally sufficient to support the jury's verdict.

Considering the entire record, we first conclude that the jury could have found Julia's and Blachford's unrebutted testimony about Michael's intended use of the property to be clear and convincing. In addition, to the extent that Li's testimony created an inconsistency about whether Michael intended to give the house to QYD based on his history of generosity toward his parents, the jury could have resolved that inconsistency in favor of its finding. Li testified that she had no contemporaneous knowledge about the purchase of 21 Fleming, and the jury charge specifically instructed that "[d]onative intent must exist at the time of the transfer, not at the time of a subsequent event." It was undisputed that at the time of the transfer, QYD lived in China, and Li had no knowledge of the purchase. Thus, considering the entire record, having given due consideration to evidence that the factfinder could reasonably have found to be clear and convincing, and having determined that a reasonable jury could have resolved disputed evidence in favor of its finding, we hold that the evidence is factually sufficient to support the verdict. *See J.F.C.*, 96 S.W.3d at 266.

23

We overrule this issue.

## IV.   The doctrine of fraud on the community does not bar the court from finding a purchase money resulting trust. (Issue 1)

QYD also argues that the court was barred from finding a purchase money resulting trust existed because her son committed fraud on the community estate when he placed title to 21 Fleming in her name at the time his divorce from Vicky was ongoing. By the time of trial in this case, both Vicky and Michael had died. Their children were alive, as were QYD and Li, QYD's only surviving child. QYD argued, through Li, her next friend, that she should retain ownership of 21 Fleming. We disagree.

"Fraud on the community" is a concept in marital property law. *Schlueter v. Schlueter*, 975 S.W.2d 584, 588 (Tex. 1998); *Everitt v. Everitt*, No. 01-11-00031-CV, 2012 WL 3776343, at *2–3 (Tex. App.—Houston [1st Dist.] Aug. 31, 2012, no pet.) (mem. op.). When making a just and right equitable division of the marital estate, a court may consider one spouse's wrong, which may justify an unequal division of the property. *Everitt*, 2012 WL 3776343, at *2. "A presumption of constructive fraud arises when one spouse disposes of the other spouse's one-half interest in community property without the other spouse's knowledge or consent." *Mazique v. Mazique*, 742 S.W.2d 805, 807–08 (Tex. App.—Houston [1st Dist.] 1987, no writ); *see Zieba v. Martin*, 928 S.W.2d 782, 789 (Tex. App.—Houston [14th Dist.] 1996, no writ). The presumption may arise even when the other spouse

24

has knowledge of the disposition, so long as she did not also consent to the disposition. *See Zieba*, 928 S.W.2d at 790. Once the presumption of constructive fraud arises, the managing spouse has the burden to show that his disposition of the property was fair to the other spouse. *Massey v. Massey*, 807 S.W.2d 391, 402 (Tex. App.—Houston [1st Dist.] 1991), *writ denied*, 867 S.W.2d 766 (Tex. 1993); *Mazique*, 742 S.W.2d at 808. The three primary factors for determining the fairness of the dispositions are: (1) the size of the property disposed of in relation to the total size of the community estate; (2) the adequacy of the estate remaining to support the other spouse after the disposition; and (3) the relationship of the parties involved in the transaction or, in the case of a gift, of the donor to the donee. *Massey*, 807 S.W.2d at 402.

Here, there is neither evidence nor a fact finding about whether Michael intended to defraud Vicky. Nor is Vicky (or a personal representative of her estate) a party to this case. We have already explained that the trial court did not err by excluding a deed to a second property at HarborWalk as a discovery sanction. And we have explained that QYD did not preserve error regarding the exclusion of the mediated settlement agreement from Michael's divorce from Vicky or emails that Michael sent to Vicky. Without an offer of proof, we are unable to determine what information would be found in those documents. In the absence of harmful error, or preservation of error, we must rely on the appellate record as it exists. While

25

Julia testified that the title to 21 Fleming was placed in QYD's name during the divorce from Vicky, nothing in the record explains why, whether Vicky agreed to the purchase in QYD's name, or whether the final divorce settlement properly compensated Vicky for her one-half community interest in the money used to buy 21 Fleming.

In addition to the lack of evidence, there was no fact finding about whether Michael intended to defraud Vicky when he placed the title to 21 Fleming in QYD's name. In a footnote in her brief, QYD asserts that the "jury received no instruction as to how to give vent to its probable interpretation of the evidence as to why [Michael] placed the deed in his Mother's name." App. Br. , n. 5. On appeal, QYD argued that the trial court erred by failing to ask the jury whether "Michael Chang violated public policy or had unclean hands when he placed title to 21 Fleming in QYD's name." We have already explained that QYD waived error regarding this specific request by failing to object to the omission of the question or request a submission of a question of fact to the jury.

There is no finding of fact that Michael intended to defraud Vicky. Nor is there evidence that the divorce decree did not account for the money spent on 21 Fleming or that Vicky did not consent to the purchase in QYD's name. We cannot reverse a trial court's judgment based on speculation from an incomplete record.

Nor can we reverse on evidentiary grounds when the alleged evidentiary error leading to the gaps in the record was not preserved.

In the absence of evidence or findings that Michael committed fraud on the community estate he once shared with Vicky, the trial court rendered judgment on the verdict, which showed that Michael purchased real property, placed title to that real property in QYD's name, and did not intend for that to be a gift to QYD. We overrule this issue and conclude that the trial court properly construed the evidence and findings as creating a purchase money resulting trust.

## Conclusion

We affirm the judgment of the trial court.


        Peter Kelly
        Justice

Panel consists of Chief Justice Adams, and Justices Kelly and Goodman.